IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR123 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH JOHNSON, and | ) | GOVERNMENT'S CONSOLIDATED |
| GARNELL JAMISON, | ) | SENTENCING AND RESTITUTION |
| | ) | BRIEF |
| Defendants. | ) | |
| | ) | |

The United States of America, by and through Bridget M. Brennan, Acting United States Attorney, and Justin Seabury Gould and Megan R. Miller, Assistant United States Attorneys, respectfully submits this sentencing memorandum.  For the forgoing reason a sentence for both defendants at the high-end of the advisory Guidelines range is appropriate.

Respectfully submitted,

BRIDGET M. BRENNAN
Acting United States Attorney

By:   /s/ *Justin Seabury Gould*
Justin Seabury Gould (OH: 084584)
Megan R. Miller (OH: 0085522)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone: (216) 622-3869/3855
Facsimile: (216) 522-2403
Justin.Gould@usdoj.gov
Megan.R.Miller@usdoj.gov

## Memorandum

**I. Summary of Offense Conduct, Charges, and Convictions**

    **A. Charged Individuals**

        i. <u>Kenneth Johnson</u>

Defendant Kenneth Johnson was a resident of the City of Cleveland, Ohio, and was elected to serve as a Councilperson for the City of Cleveland. Johnson was elected to represent Ward 4, which included the Buckeye-Shaker neighborhood.

        ii. <u>Garnell Jamison</u>

Defendant Garnell Jamison worked for the City of Cleveland, Ohio, as Johnson's Executive Assistant, a position Jamison held for over 20 years. Jamison was responsible for assisting Johnson with administrative tasks, including those required for Johnson's various projects in Ward 4.

        iii. <u>John Hopkins</u>

Co-conspirator John Hopkins was a resident of Cleveland Heights, Ohio. Hopkins was Executive Director of Buckeye Shaker Square Development Corporation ("BSSDC"). In that capacity, his responsibilities included authorizing BSSDC to issue checks, reviewing BSSDC expenditures, and submitting appropriate expenditures for reimbursements from grants awarded by the City.

        iv. <u>Robert Fitzpatrick</u>

Co-conspirator Robert Fitzpatrick worked for the City of Cleveland, Ohio, in the Division of Recreation. Fitzpatrick began his work for the City in or around 1985. Fitzpatrick worked in various positions within the Division of Recreation until being promoted to regional manager in

2010.  In this position, Fitzpatrick oversaw operations at seven recreation centers within the City which included directly supervising the center manager at each recreation center.

### B.    Charged Schemes

#### i.    The $1,200 Cleveland Reimbursement Scheme

In the City of Cleveland, each member of City Council had a Council member expense account.  Each month, Council members could be reimbursed for up to $1,200 in eligible Council-related expenses.  Expenses eligible for reimbursement included in-home or rental office expenses, printing or postage costs, telephone expenses, automobile expenses, or payments made to service providers.  Council members had to complete the City's Form M-1 ("Council Member Expense Report") to receive reimbursement each month, documenting how much money the Council member spent on eligible expenses in a given month.  Council members were also required to provide supporting documentation to verify the legitimacy of the expenses they submitted for reimbursement.  After a Council member submitted the Council Member Expense Report and supporting documentation, an administrative employee for Council reviewed the claim and approved or denied the reimbursement.  If approved, the City issued a check to the Council Member for the amount approved for reimbursement.

Over ten years ago, Johnson and Jamison approached Fitzpatrick and asked him to perform ward services in Ward 4.  These tasks included cutting grass, checking on properties, assisting with snow removal, and looking for potential homes that could be renovated and sold for a profit.  Fitzpatrick performed ward services for approximately six weeks in or around 2010.  Neither Johnson nor Jamison ever paid Fitzpatrick for the ward services he performed.  Fitzpatrick continued to receive his salary from the City.  Fitzpatrick did not perform any ward services after the initial six weeks in or around 2010.

From in or around January 2010, to in or around October 2018, Jamison regularly delivered time sheets to Fitzpatrick and instructed him to sign them.  Fitzpatrick complied, even though he did not actually perform any ward services beyond the initial six weeks.  Each time sheet was a document that purported to reflect the hours that Fitzpatrick performed ward services in Ward 4.  Jamison collected the completed time sheets from Fitzpatrick and delivered them to Johnson.

From in or around January 2010, to in or around October 2018, Johnson submitted the false Council Member Expense Reports to the City.  He attached Fitzpatrick's false time sheets to each of the false Council Member Expense Reports.  He also attached receipts purporting to reflect that he had paid Fitzpatrick $1,200 in cash for performing ward services.  Each receipt purported to bear Fitzpatrick's signature.  Johnson requested the maximum reimbursement – $1,200 – every month.  Johnson made these reimbursement requests for ward services that Fitzpatrick purportedly performed in Ward 4.  Based on reimbursement requests submitted from January 28, 2010, to on or about October 16, 2018, the City issued $1,200 monthly expense reimbursement checks to Johnson totaling approximately $127,200.  Each expense reimbursement check from the City was deposited into Johnson's personal bank account.

Johnson testified that he has met Robert Fitzpatrick when Fitzpatrick was around 12 years old.  (R. 128: Johnson, K., Trial Tr., PageID 3910).  Johnson described Fitzpatrick as "one of the kids that came to the rec center."  (Id.)  Johnson noted that Fitzpatrick would "never leave [his] side when he was at the rec[,]" and would "always be with [Johnson]."  (Id., PageID 3911).  Johnson described his relationship with Fitzpatrick as "close" and even allowed Fitzpatrick to live with him in his late teens.  (Id.)  Johnson described that he "literally raised" Fitzpatrick.  (Id., PageID 3927).  Johnson even recommended Fitzpatrick's children and wife for to the Mayor

4

of Cleveland for employment with the City.  (Id., PageID 3929).  Johnson abused this long-standing relationship and the dependance of Fitzpatrick's family on City employment to cause Fitzpatrick to participate in the $1,200 scheme.  Jamison had previously told federal agents that Johnson was the one who selected Fitzpatrick to participate in the scheme.  (R. 122: Eyer, Trial Tr., PageID 3390).  Jamison admitted to agents that he would pick up timesheets from Fitzpatrick every month and deliver them to Johnson.  (Id.).

Johnson testified that he paid Robert Fitzpatrick consistent with what he placed on his monthly expense report.  (R. 128: Johnson, K., Trial Tr., PageID 3909-10, 3926).  Johnson testified that Fitzpatrick "insisted that [Johnson] pay him in cash because [Fitzpatrick] didn't want his wife and other people to know how much money [Johnson] was paying him."  (Id., PageID 3921).  Johnson even admitted to filling out a W-4 tax form at the end of the year to attest to what he had paid Fitzpatrick.  (Id., PageID1).  Federal agents, however, analyzed Johnson's bank records and did not see any pattern of money around $1,200, in any form, leaving Johnson's accounts every month as payment to Fitzpatrick.  (R. 122: Eyer, Trial Tr., PageID 3398).  There was also no pattern of money, in any form, regularly going into Fitzpatrick's bank account to suggest that he was receiving payments from Johnson.  (Id., PageID 3398-99).

Notably, Johnson had an unsustainable need for cash.  Special Agent Eyer testified that the average income into Johnson's personal bank account was $15,100 per month and the average outflow was $15,400.  (R. 122: Eyer, Trial Tr., PageID 3381-82).

ii.     The Buckeye Shaker Development Corporation Scheme

In Ohio, Community Improvement Corporations like BSSDC were nonprofit, community-focused entities formed to support their affiliated city neighborhoods with a range of

programs, including affordable housing, economic development, safety, and social services.  The BSSDC was the main Community Improvement Corporation in Ward 4.  The City administered a program through which it distributed federal Community Development Funds to the BSSDC via community block grants.  The City's distribution of these funds was subject to certain federal laws restricting how the funds could be used.

Each member of Council had authority to direct the City to allocate and distribute federal community development funds.  Members of Council exercised this authority by executing forms, including a form called the Council Authorization for the Use of Neighborhood Development Activity/Community Development Block Grant Funds ("CDBG Funds Authorization Forms").  Johnson used his authority as a member of Council to direct the City to allocate, and later distribute, federal Community Development Funds to BSSDC by signing CDBG Funds Authorization Forms.

Hopkins was Executive Director of BSSDC.  He signed contracts on behalf of BSSDC accepting federal Community Development Funds and agreed to abide by the terms of the distribution in accordance with 24 CFR § 570.611.  24 CFR § 570.611 and the City's conflict of interest prohibitions related to the distribution and receipt of Community Development Funds prohibited any person, or family of a person, who was an employee, agent, consultant, officer, or elected official of the BSSDC or the City, from personally benefitting from the federal Community Development Funds.  (Gov't Ex. 2201-04; R. 117: Hopkins, Trial Tr., PageID 2919-21).  The City required recipients of Community Development Funds to sign a contract agreeing to these restrictions.  From in or around December 2013, to in or around March 2018, Hopkins signed not less than approximately $50,000 in BSSDC checks issued to third parties, which were later deposited or transferred into bank accounts held or controlled by Johnson.  These checks

were issued for work purportedly done in the BSSDC landscaping program.  Despite being

employed by the City as Johnson's executive assistant, Jamison was the supervisor of the

program at BSSDC.  (R. 117: Hopkins, Trial Tr., PageID 2922).  Specifically, Jamison would

receive timesheets from workers in the landscaping program, provide those sheets to Hopkins,

collect the resulting paychecks from BSSDC, and was responsible for distributing these payroll

checks to the landscaping workers.  (Id., PageID 2991).  This is notable because, as detailed

below, a timesheet bearing Kevin Johnson's signature reflected that he worked for BSSDC after

8:00 p.m., which Kevin Johnson denies.  Additionally, timesheets submitted for Kenneth

Johnson, Jr., show that he was working for BSSDC's landscaping program during a period that

he was in Indiana obtaining his CDL.  (R. 112: Kenneth Johnson, Jr., Trial Tr. PageID 2862-63).

The City informed Hopkins that BSSDC could no longer pay certain individuals

including Kevin Johnson, Michael Johnson, Bryan Johnson, Garnell Jamison, and Kenneth

Johnson, Jr., because their payment constituted a breach of the conflict-of-interest provisions in

that they were (1) related to Johnson and/or (2) employees of the City.  (Id., PageID 2923-2925).

Hopkins asked Johnson if BSSDC could remove these individuals from the payroll because of

the financial strain it was placing on the Organization.  (Id., PageID 2926-28).  Johnson ensured

Hopkins that he would get more money for BSSDC to keep these individuals on the payroll.

(Id., PageID 2928).  Jamison even arranged for Hopkins to issued BSSDC bonus checks to Kevin

Johnson, Kenneth Johnson, Jr., and even Garnell Jamison himself.  (Id., PageID 2928).

Notably, during a period that BSSDC was unable to make their general payroll

obligations, BSSDC continued to pay one of Johnsons children, Kevin Johnson.  (R. 122: Eyer,

Trial Tr., PageID 3408-09).  These checks were deposited into Johnson's PNC bank account.

(Id.).  Johnson testified that his children would endorse their payroll checks from BSSDC, give

them to him, and he would sign and deport them into his bank account.  (R. 128: Johnson, K., Trial Tr., PageID 3944-46).  Johnson specifically testified about how this process worked for Kevin Johnson, Michael Johnson, and Kenneth Johnson, Jr.  (Id.).  Despite these claims, there was no pattern of money, in any form, leaving Johnson's bank account to suggest that he was giving any portion of these checks to Kevin Johnson, Kenneth Johnson, Jr., or Michael Johnson. (R. 122: Eyer, PageID 3429-30).

        iii.      <u>The Tax Scheme</u>

For calendar years 2013, 2014, 2015, 2016, 2017, and 2018, Johnson and Jamison submitted and caused the submission of false and fraudulent United States Individual Income Tax Returns, Forms 1040, for Johnson to the Internal Revenue Service.   Louise Neal testified that she had prepared Johnson's taxes from 1993 to 2018.  (R. 122: Neal, Trial Tr., PageID 3217-18).  Johnson eventually caused Jamison to work with Neal to prepare and file Johnson's annual tax returns stating, "I'm sending Garnell with my papers."  (Id., PageID. 3218).  If Neal needed additional records or documentation, it was Garnell who brough them, but only after checking with Johnson.  (Id., PageID 3219-20).  Johnson and Jamison knew that the returns were false and fraudulent in that each return understated Johnson's total income on line 22 by underreporting his income and inflating the value of his itemized deductions.

One of the fraudulent deductions involved two Buick LeSabre vehicles donated by Johnson to the Our Lady of the Wayside charity in 2016 and 2018.  (Gov't Ex. 3046-54, 3069-76).  Our Lady of the Wayside issued two tax documents to Johnson documenting the price for which it sold each of these donated vehicles.  (Gov't Ex. 3044-45).  These forms reflected that the LeSabre donated in 2016 sold for $1,200, and the LeSabre donated in 2018 sold for $2,800. (Id., Gov't Ex. 3046-47).  However, instead of using these forms, Johnson and Jamison

submitted false and fabricated forms reflecting instead that the LeSabre donated in 2016 sold for $36,000 and the LeSabre donated in 2018 sold for $43,134.  (Gov't Ex. 3042-43).  Despite receiving these actual donation records from Our Lady of the Wayside, Johnson and Jamison provided Neal with these false records showing the inflated donation number.  (R. 122: Neal, Trial Tr., PageID 3252-57).  Another fraudulent deduction involved a more than $20,000 kitchen renovation Johnson purportedly donated to the former Kenneth Johnson Recreation Center in 2015.  (Gov't Ex. 3058-60).  Johnson testified that he renovated the kitchen at the former Kenneth Johnson Recreation Center in 2015.  (R. 128: Johnson, K., Trial Tr., PageID 3902-03).  Johnson specifically testified that he had purchased the dishwasher, stove, and refrigerator out of his personal funds from a company called Bloom Brothers.  (Id., PageID 3902).  Despite alleging he donated a kitchen renovation worth well in excess of the City's $10,000 donation threshold Johnson had no letter from the City, no ordinance from the City, and nothing other than the fraudulent records he created with Jamison and Elijah Johnson to document this purported donation.  (R. 128: Johnson, K., Trial Tr., PageID 3996-98).  In fact, the Kitchen at the recreation center has not changed since 2008.  (R. 117: Wilcox, Trial Tr., PageID 3073-74).  Johnson also made false deductions for unreimbursed employee expenditures related to Robert Fitzpatrick when (1) Johnson had never made these expenditures to Fitzpatrick, and (2) the City had actually paid false $1,200 reimbursement claims to Johnson.  Johnson did not claim any of the $1,200 reimbursement payments he received from the City on his taxes.

       iv.       <u>The Justice Scheme</u>

On or about October 2, 2020, Johnson and Jamison attempted to persuade and influence the testimony of a grand jury witness Elijah Johnson by meeting with him and providing him with false and fraudulent information and records purporting to document charitable donations

made by Johnson and other material information.  (Gov't Ex. 4001).  This meeting occurred just

two months after Johnson was served with a federal target letter and a month after Elijah Johnson

received a subpoena to appear before the grand jury.  (Gov't Ex. 2002; R. 127: Miller, Trial Tr.,

PageID 3573).

### C.    Charges and Convictions

On Friday, July 30, 2021, after an approximately two-week trial, a jury returned a verdict

finding Johnson and Jamison guilty of all counts:

| | |
|---|---|
| Count 1: | Kenneth Johnson and Garnell Jamison<br>Conspiracy to Commit Federal Program Theft, 18 U.S.C. § 371 |
| Count 2: | Kenneth Johnson<br>Conspiracy to Commit Federal Program Theft, 18 U.S.C. § 371 |
| Counts 3,<br>4, and 5: | Kenneth Johnson<br>Federal Program Theft, 18 U.S.C. §§ 666(a)(1)(A) and 2 |
| Counts 6,<br>7, and 8: | Kenneth Johnson and Garnell Jamison<br>Federal Program Theft, 18 U.S.C. §§ 666(a)(1)(A) and 2 |
| Counts 9,<br>10, 11, 12,<br>and 13: | Kenneth Johnson and Garnell Jamison<br>Aiding and Assisting in the Preparation of False Tax<br>Returns, 26 U.S.C. § 7206(2) |
| Count 14: | Kenneth Johnson and Garnell Jamison<br>Tampering with a Witness, 18 U.S.C. §§ 1512(b)(1) and (2) |
| Count 15: | Kenneth Johnson and Garnell Jamison<br>Falsification of Records in Federal Investigations,<br>18 U.S.C. §§ 1519 and 2 |

## II.    Applicable Law

As the Court is aware, after the decision of the United States Supreme Court in *United*

*States v. Booker*, 125 S. Ct. 738 (2005), the Sentencing Guidelines were rendered advisory for all

criminal cases, and district courts were given enhanced discretion in the sentencing of criminal

defendants. *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005).

Nonetheless, to secure nationwide consistency, "the [Sentencing] Guidelines should be the starting point and the initial benchmark." *United States v. Gall*, 128 S.Ct. 586, 596-97 (2007); *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* (citing *United States v. Rita*, 127 S. Ct. 2456, 2465 (2007)) (observing that Congress mandated that the United States Sentencing Commission write sentencing guidelines that would carry out the objectives of 18 U.S.C. §3553(a)). *See* 28 U.S.C. § 991(b). Once the guidelines have been considered, the court should, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, consider all the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97.

After making the Guideline calculation, a sentencing judge is to consider the factors outlined in Title 18, United States Code, Section 3553(a). The Sixth Circuit Court of Appeals requires that a district court provide a reasonable explanation of its application of the sentencing factors set forth in Title 18, Section 3553 of the United States Code in imposing sentence. In *United States v. Blackwell, 459 F.3d at 739*, 773 (6th Cir. 2006), the Sixth Circuit announced:

> The job of the district court is to impose "'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)." In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors. While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review. . . . This Court will only uphold a sentence if it is reasonable. Reasonableness contains two facets: substantive and procedural. In reviewing for reasonableness, the Court employs a presumption for substantive reasonableness.

(Citations omitted.) *Id.* The Sixth Circuit has stated that, "while a district court need not engage in a 'ritualistic incantation' of the § 3553(a) factors, its reasoning must be 'sufficiently detailed

to reflect considerations listed in § 3553(a) and to allow for meaningful appellate review."

*United States v. Tanner*, 2010 WL 2545589, No. 09-5177, (6th Cir. June 11, 2010) (quoting

*United States v. Bolds*, 511 F.3d 568, 581 and *United States v. Mayberry*, 540 F.3d 506, 518 (6th

Cir. 2008)).  Therefore, a district court must impose a reasonable sentence while expressing

enough of its rationale to permit an appellate court to understand the basis for the sentence

imposed.

### III.    The Sentencing Guidelines Calculations

When fashioning an appropriate sentence for a defendant, a court must first consider the

applicable guidelines range under 18 U.S.C. § 3553(a)(4).  *United States v. Thompson*, 515 F.3d

556, 560 (6th Cir. 2008).  Although the sentencing guidelines are advisory, they are the "starting

point and the initial benchmark" for federal sentencing.  *Id*. at 560-61. A court may find facts by

a preponderance of the evidence when calculating the appropriate guidelines range.  *United*

*States v. Gates*, 461 F.3d 703, 707-08 (6th Cir. 2006).  Once a court has determined the

appropriate sentencing range, it should then consider that range considering the other relevant §

3553(a) factors.  *Thompson*, 515 F.3d at 561.

### A.    Guidelines for Kenneth Johnson

| Group 1: Federal Program Theft | | |
|---|---|---|
| **Counts 1-2: Title 18 U.S.C. § 371 (Conspiracy to Commit an Offense); and Counts 3-8: Title 18 U.S.C. § 666(a)(1)(A) (Theft Concerning a Program Receiving Federal Funds)** | | |
| Base offense level | 6 | § 2B1.1(a)(2) |
| Loss: More than $550,000, but not more than $1,550,000 | 14 | § 2B1.1(b)(1)(H) |
| Role Enhancement: Organizer or Leader | 4 | § 3B1.1(a) |
| Abuse of Position of Public or Private Trust | 2 | § 3B1.3 |
| Use of a Minor | 2 | § 3B1.4 |
| Obstruction of Justice | 2 | § 3C1.1 |
| **Subtotal** | **30** | |

| Group 2: Tax[1] | | |
|---|---|---|
| **Counts 9-13: 26 U.S.C. § 7206(2) (Aiding and Assisting in the Preparation of False Tax Returns)** | | |
| Base offense level: Tax loss more than $100,000 but not more than $250,000 | 16 | § 2T1.4 (a)(1) and 2T4.1(H) |
| Obstruction of Justice | 2 | § 3C1.1 |
| **Subtotal** | **18** | |

| Multiple Count Adjustment | | |
|---|---|---|
| Group | Adjusted Offense Level | Units |
| 1 | 30 | 1 |
| 2 | 18 | 0 |
| Total Units | | **1** |
| Increase Under §3D1.4 | | **0** |
| **Combined Adjusted Offense Level** | | **30** |

### B.  Guidelines for Garnell Jamison

| Group 1: Federal Program Theft | | |
|---|---|---|
| **Counts 1-2: Title 18 U.S.C. § 371 (Conspiracy to Commit an Offense); and Counts 3-8: Title 18 U.S.C. § 666(a)(1)(A) (Theft Concerning a Program Receiving Federal Funds)** | | |
| Base offense level | 6 | § 2B1.1(a)(2) |
| Loss: More than $550,000, but not more than $1,550,000 | 14 | § 2B1.1(b)(1)(H) |
| Role Enhancement: Manager or Supervisor | 3 | § 3B1.1(b) |
| Abuse of Position of Public or Private Trust | 2 | § 3B1.3 |
| Obstruction of Justice | 2 | § 3C1.1 |
| **Subtotal** | **27** | |

| Group 2: Tax[2] | | |
|---|---|---|
| **Counts 9-13: 26 U.S.C. § 7206(2) (Aiding and Assisting in the Preparation of False Tax Returns)** | | |
| Base offense level: Tax loss more than $100,000 but not more than $250,000 | 16 | § 2T1.4 (a)(1) and 2T4.1(H) |
| Obstruction of Justice | 2 | § 3C1.1 |
| **Subtotal** | **18** | |

---

[1]     The probation department has calculated substantive Counts 14 (tampering) and 15 (falsification) into Group 2 as a two-level Obstruction enhancement under Section 3C1.1.

[2]     The probation department has calculated substantive Counts 14 (tampering) and 15 (falsification) into Group 2 as a two-level Obstruction enhancement under Section 3C1.1.

| Multiple Count Adjustment | | |
|---|---|---|
| Group | Adjusted Offense Level | Units |
| 1 | 27 | 1 |
| 2 | 18 | 0 |
| Total Units | | **1** |
| Increase Under §3D1.4 | | **0** |
| **Combined Adjusted Offense Level** | | **27** |

**C.  Analysis of Loss Calculation and Sentencing Enhancement**

  i.  <u>Calculation of Fraud Loss</u>

The government agrees with the fraud loss calculated by the Probation department

intends to call a witness at sentencing to more fully establish the loss figures found in the PSR.

  ii.  <u>Calculation of Tax Loss</u>

The government agrees with the tax loss calculated by the Probation department intends

to call a witness at sentencing to more fully establish the loss figures found in the PSR.

  iii.  <u>Role Enhancement: Organizer or Leader (Johnson Only)</u>

The Probation Department has accurately applied four-level enhancement because

Johnson was an organizer or leader.  Under § 3B1.1(a), a defendant's offense level should be

increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that

involved five or more participants or was otherwise extensive[.]"  U.S.S.G. § 3B1.1(a).  A

participant is "a person who is criminally responsible for the commission of the offense, but need

not have been convicted."  U.S.S.G. § 3B1.1, appl. n.1.  This Court should consider Johnson's

"exercise of decision making authority, the nature of participation in the commission of the

offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

crime, the degree of participation in planning or organizing the offense, the nature and scope of

the illegal activity, and the degree of control and authority exercised over others."  *United States

v. McDaniel*, 398 F.3d 540, 551 (6th Cir. 2005) (quoting U.S.S.G. § 3B1.1 appl. n.4).  A district

court need not find each factor to warrant an enhancement.  *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006).  Additionally, this Court must find that find that Johnson "exerted control over at least one individual within [the] criminal organization…"  *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (internal quotation marks omitted); *see also* U.S.S.G. § 3B1.1 app. n.2.  A defendant whose sentence is enhanced under U.S.S.G. § 3B1.1(a) or (b) need not directly supervise more than five persons, so long as the defendant exerted some level of control or influence over at least one of five or more persons involved in the criminal activity.  *United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009) (citing *United States v. Robinson*, 503 F. 3d 522, 529 (6th Cir. 2007)).

Here, the participants included Jamison, Hopkins, Fitzpatrick, Kevin Johnson, and Johnson himself.  Johnson had an employer-employee relationship with Jamison and directed him regularly.  Johnson directed Hopkins to keep invalid individuals on BSSDC's payroll.  Hopkins complied.  Afterall, losing then Councilman Johnson's support would have been a "death knell" for BSSDC.  (R. 117: Hopkins, Trial Tr., PageID 2985).  Johnson developed his relationship with Fitzpatrick when Fitzpatrick was a child.  Johnson ensured that Fitzpatrick, his children, and his wife were all employed with the City.  Then, when Johnson needed a participant in his scheme, he came to collect on these favors.  Johnson even took advantage of his on son, Kevin Johnson, to fraudulently obtain money from the BSSDC payroll program.  Additionally, enriching Johnson was the primary goal of the conspiracy in this matter.  Johnson took the lion's share of the proceeds of the fraud and tax scheme.

Johnson argues that the enhancement should not apply because there were less than five participants because Kevin Johnson was not criminally responsible for the scheme.  (R 159: Johnson's Sentencing Brief, PageID 4631-32).  This argument is without merit.  As detailed

above, Kevin Johnson completed fraudulent timesheets that falsely reflected he has worked certain hours for BSSDC that, in fact, he had not.  Kevin Johnson then submitted these timesheets to BSSDC, which issued paychecks to Kevin Johnson.  Kevin Johnson would then distribute these checks to Johnson for deposit into his account.  All the while knowing the reported hours were false and knowing that Kenneth Johnson was not giving him the proceeds of these checks.

      iv.      <u>Role Enhancement: Manager or Supervisor (Jamison Only)</u>

The Probation Department has accurately applied three-level enhancement because Jamison was an organizer or leader.  Under § 3B1.1(b), a three-level enhancement applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive…"  U.S.S.G. § 3B1.1(b).  The Application Note 4 factors and requirement that Jamison managed or supervised at least one of the five participants, as outlined above, also apply to this Section 3B1.1(b) enhancement.

As outlined above, the participants included Johnson, Hopkins, Fitzpatrick, Kevin Johnson, and Jamison himself.  Jamison argues that he was not a manager or supervisor of Fitzpatrick or Kevin Johnson.  (R. 158: Jamison Sentencing Brief, PageID 4614-16).  In fact, as Johnson's figurehead, Jamison played an important role in supervising the participants in this scheme.  Jamison ensured that Fitzpatrick completed and submitted timesheets.  Jamison even provided Fitzpatrick with false tax forms to help cover-up the fraud by reporting income to the IRS that Fitzpatrick did not actually receive.  (R. 110: Fitzpatrick, Trial Tr., PageID 2516).  When negative news broke about the fraudulent reimbursement scheme, Jamison told Fitzpatrick not to worry and that everything would be okay.  (<u>Id.</u>, PageID 2518).  When it comes to Kevin Johnson, Jamison was his literal supervisor.  But, as Jamison notes, title by itself is not enough.

16

But here, Jamison took the timesheets from Kevin Johnson, delivered them to Hopkins for

payment, and then received and distributed the resulting paychecks.  Additionally, Jamison

directed Hopkins to issue bonus checks to certain individuals.

     v.         <u>Abuse of Position of Public or Private Trust</u>

The Probation Department accurately applied a two-level enhancement because Johnson

and Jamison abused positions of public or private trust.  Under § 3B1.3, a two-level enhancement

applies "[i]f the defendant abused a position of public or private trust…in a manner that

significantly facilitated the commission or concealment of the offense…" U.S.S.G. § 3B1.3.  The

Guidelines define a position of "public or private trust" as one that is:

> [C]haracterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, appl. n.1.

Kenneth Johnson was an elected councilmember for the City.  He has almost unilateral

decision making that helped facilitate the fraud in this case.  For instance, John Fennelly, a City

employee in the Community Development Department, testified that the is was so easy for a

councilperson to designate Black Grand funds that the funds were referred to as "Councilmatic" funds.  (R. 112: Fennelly, Trial Tr., PageID 2764).

As Johnson's executive assistant of over 20-years, he acted as almost figurehead for Johnson.  For example, Jamison was able to drop off Johnson's reimbursement requests to Carrie Rentz without question.  (R. 110: Rentz, Trial Tr., PageID 2393).  As detailed above, Jamison also was able to bring Johnson's tax forms to the tax preparer and cause BSSDC to issue bonus checks.

      vi.      <u>Use of a Minors</u>

The Probation Department accurately applied a two-level enhancement because Johnson used minors to commit the fraud in this case.  Under U.S.S.G. § 3B1.4, a two-level enhancement applies when a defendant "used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense[.]"  The phrase "used or attempted to use" is includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting."  U.S.S.G. § 3B1.4, appl. n.1.  The government is required to show that the defendant actively and intentionally used a minor in the commission of the offense.  *United States v. Butler*, 207 F.3d 839, 848-49 (6th Cir. 2000).  ("Congress' inclusion of these considerations indicates that to deserve § 3B1.4 enhancement, one must do more than simply participate in crime with a minor.").  However, the children used in the offense need not have any knowledge of what they were doing.  *See United States v. Jenkins*, 229 F. App'x 362, 369 (6th Cir. 2005) ("USSG § 3B1.4…does not impose a knowledge requirement on the minor who is used in the commission of the offense.") (internal quotation and citations omitted).

18

As Johnson's PSR notes, from June 30, 2014, through January 12, 2018, Hopkins issued approximately 75 BSSDC payroll checks totaling approximately $7,136.15 to Michael Johnson (aka Michael Rodriguez-Cornier).  (R. 153: Johnson Final PSR, PageID 4574-75).  Michael Johnson was born on June 24, 2001.  (Id.).  He was a minor at the time he was involved in the offense.  He turned eighteen years old on June 24, 2019.  (Id.).  Johnson called Michael Johnson as a trial witness.  Notably, Michael Johnson denied cutting grass for BSSDC during the time June 2014 and January 2018.  (R. 127: Michael Johnson, Trial Tr., PageID 3687).  He stated he only started cutting grass for BSSDC "a couple years" before his testimony, and then only as a volunteer.  (Id.).   He did, however, work for the former Kenneth Johnson Recreation Center.  (Id.).  Michael Johnson came from a family in Puerto Rico that "did have much[.]"  (Id., PageID 3666).  Johnson's family knew Michael Johnson's family.  (Id.).   When Michael Johnson was just 13 years old, he began living with Johnson.  (Id., PageID 3666-67).

From December 28, 2012, through March 29, 2019, Hopkins issued approximately 104 BSSDC payroll checks totaling approximately $34,178.75 to Kevin Johnson. Kevin Johnson was born on April 11, 1996 and turned 18 years old on April 11, 2014.  (Id.; R. 127: Kevin Johnson, Trial Tr., PageID 3721).  During part of the offense, he was also a minor child.  Johnson called Kevin Johnson as a trial witness.  Kevin Johnson does not know the circumstances of how he came to live in the United States from his homeland, the Marshall Islands.  (R. 127, Kevin Johnson, Trial Tr., PageID 3690-91).  He does not know his birth parents or have contact with them.  (Id., PageID 3691).  His earliest memory of Johnson was when Kevin Johnson came to the United States when he was about seven or eight years old.   (Id., PageID 3690-01).  As late as a week before his testimony, Kevin Johnson worked for the City of Cleveland in the Recreation Center.  (Id., PageID 3707-08).  Kevin Johnson testified that before he turned eighteen, he gave

some of his BSSDC payroll checks to Johnson.  (Id., PageID 3719).  Johnson helped Kevin

Johnson get a job at BSSDC.  (Id., PageID 3734).  Kevin Johnson testified that he never did

work for BSSDC dafter 8:00 p.m.  (Id., PageID 3712).  However, he signed time sheets showing

that he was working for BSSDC after 8:00 p.m.  (Id., PageID 3724).

   The evidence, testimony, and Probation Department investigation show that Johnson took

custody of young men from disadvantages backgrounds.  They lived with him.  He placed them

in positions to work for BSSDC.  Even when John Hopkins expressed to Johnson the financial

that paying Kevin Johnson, Michael Johnson, and Kenneth Johnson, Jr. was putting on BSSDC,

Johnson ensured that these individuals remained on the payroll.

   vii.  <u>Obstruction</u>

   The Probation Department accurately applied an enhancement because Johnson and

Jamison obstructed justice.  Under U.S.S.G. § 3C1.1 a two-level enhancement applies when:

> (1) the defendant willfully obstructed or impeded, or attempted to
> obstruct or impede, the administration of justice with respect to the
> investigation, prosecution, or sentencing of the instant offense of
> conviction, and
>
> (2) the obstructive conduct related to
>
> > (A) the defendant's offense of conviction and any relevant
> > conduct; or
> >
> > (B) a closely related offense

Obstructive conduct can vary widely in nature, degree of planning, and seriousness.  *Id.*, appl.

n.3.

   There are several reasons the obstruction enhancement applies.  Regarding the tax

scheme, Group 2, the enhancement applies based on the substantive convictions the defendant's

sustained in counts 14 and 15.  *See* U.S.S.G. 3C1.1 appl. n.4(I).

Additionally, Fitzpatrick testified that after he was approached by federal agents in the Summer of 2020, Johnson and Jamison approached him a series of times.  (R. Fitzpatrick, Trial Tr., PageID 2529-37).  The day after federal agents approached Fitzpatrick, Johnson and Jamison called him on the phone.  (Id.).  Jamison asked where Fitzpatrick was headed, and Fitzpatrick informed the defendants that he was headed to work.  (Id.).  Jamison met Fitzpatrick at work and asked whether anybody had visited Fitzpatrick's home.  (Id.).  Fitzpatrick disclosed that the FBI had visited him.  (Id.).  Jamison told Fitzpatrick that if anybody else should visit him he should make no comment.  (Id.).  Later, when Fitzpatrick was walking to a youth football game in his neighborhood Johnson and Jamison approached him in a vehicle and Johnson told Fitzpatrick "you're being awful quiet."  (Id.).  Finally, Johnson and Jamison followed Fitzpatrick as he drove to a local gas station.  (Id.).  Johnson and Jamison checked Fitzpatrick for his phone and looked in his trunk.  (Id.).  Johnson and Jamison again inquired if anybody had approached Fitzpatrick.  (Id.).  Johnson specifically told Fitzpatrick that if anybody should approach him, he should tell "them I was giving you $300 and you were signing receipts" and Jamison reiterated that message.  (Id.).  This type attempt to influence a witness through intimidation is precisely when this enhancement should apply.  *See* U.S.S.G. 3C1.1 appl. n.4(A), *see also United States v. French*, 976 F.3d 744 (6th Cir. 2020).

Additionally, regarding Johnson, the Sixth Circuit has affirmed this Court's application of 3C1.1 to instances where a defendant provides martially false testimony at trial. *United States v. Russ*, 600 F. App'x 438 (6th Cir. 2015).  As detailed above, Johnson testified that he paid Robert Fitzpatrick consistent with what he placed on his monthly expense report.  (R. 128: Johnson, K., Trial Tr., PageID 3909-10, 3926).  Johnson even admitted to filling out a W-4 tax form at the end of the year to attest to what he had paid Fitzpatrick.  (Id., PageID1).

Federal agents, however, analyzed Johnson's bank records and did not see any pattern of money around $1,200, in any form, leaving Johnson's accounts every month as payment to Fitzpatrick. (R. 122: Eyer, Trial Tr., PageID 3398).  There was also no pattern of money, in any form, regularly going into Fitzpatrick's bank account to suggest that he was receiving payments from Johnson.  (Id., PageID 3398-99).  This false testimony is central to the case against Johnson. Finally, once the jury returned its verdict, the government requested that the Court remand Johnson given his proximity to the community on which he inflicted such damage and "specifically that witness, Robert Fitzpatrick, who lives in the same neighborhood" as Johnson. (R. 132: Trial Tr., PageID 4366).  The Court inquired of Johnson where he was going to be residing, noting Johnson's trial testimony that he moved from the neighborhood.  (Id., PageID 4367).  Johnson told the Court that he was going to be living at "1377 East Boulevard, Number 5."  (Id.).  The Probation Department, however, found that Johnson still owned and was living on Hampton—in Fitzpatrick's neighborhood.  (R. 153: Johnson Final PSR, PageID 4569, 4585-86). The Court should consider if Johnson's lie was material to its decision regarding bond.

## IV.     The § 3553(a) Factors Warrant a Custodial Sentence at the High-End of the Guidelines Range

Under 18 U.S.C. § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Those purposes are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from future crimes of the defendant; and
>
> (D)     to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).  In determining the appropriate sentence, the court must

consider:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the four legitimate purposes of sentencing (described above);
>
> (3)   the kinds of sentences available;
>
> (4)   the Guidelines range itself;
>
> (5)   any relevant policy statement by the Sentencing Commission;
>
> (6)   the need to avoid unwarranted sentence disparities among defendants; and
>
> (7)   the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1)-(7).

Considering the nature and circumstances of the offense of conviction, the need to afford

adequate deterrence, and the need to avoid unwarranted sentencing disparities, the government

submits that a custodial sentence at the high-end of the Guidelines range is sufficient but not

greater than necessary.

## A.     Nature and Circumstances of the Offenses

There is an insidious sort of deception that occurs in public corruption cases.  *See United

States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill.) *aff'd* 447 F.3d 517 (7th Cir. 2006) ("Public

corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It

undermines the essential confidence in our democracy and must be deterred if our country and

district is ever to achieve the point where the rule of law applies to all—not only to the average

citizen, but to all elected and appointed officials").  It is a deception hidden in the skilled act of

convincing the electorate that one is decent, honest, and true when, in fact, one is engaged in

23

fraud and self-dealing.  Former Cleveland City Councilman, Defendant Kenneth Johnson, and his former Executive Assistant, Defendant Garnell Jamison, carried on their ruse together.  Each working in concert to convince the citizens of the city of Cleveland that Johnson was a champion for the Buckeye-Shaker neighborhood in Cleveland's Ward 4.  In fact, Johnson was funding his unsustainable monthly cash needs by siphoning public money offered in the service of one of Cleveland's most vulnerable communities.

The Guidelines contemplate an enhancement when defendants target a particularly vulnerable *individual*.  (*See*, U.S.S.G. § 3A1.1).  This provision, however, is not tailored to crimes like Johnson and Jamison perpetrated against particularly vulnerable *communities*.  The Court should understand and consider the challenges faced by the community from which Johnson and Jamison stole.  The Center for Community Solutions ("CCS") is a local nonpartisan think tank that uses public data to find solutions to health, social, and economic issues.  The CCS issues City of Cleveland Neighborhood Fact Sheets, which highlight demographic, health, and social indicators for each neighborhood in the City of Cleveland and include basic demographic information about each neighborhood and data on employment and income, poverty, education, housing, and health.  This includes a fact sheet on Cleveland's Ward 4, last released in 2016.[3] The CCS reports that nearly 20,000 people live in Ward 4.  Over 95% of the residents are African American.  Over a quarter of adults live with a disability.  Only 54% those 16 years of age or older participate in the work force.  Over 63% of the entire population is eligible to

---

[3]     The Center for Community Solutions, *Ward Profile: Cleveland Ward 4*, https://www.communitysolutions.com/resources/community-fact-sheets/cleveland-neighborhoods-and-wards (Last accessed Sept. 29, 2021)

receive assistance from food banks with 38% of all people and over 60% of all children living in poverty.

But Johnson and Jamison's dishonesty went far beyond a deception of and theft from the public.  They also lied to and manipulated City of Cleveland employees, workers at the Buckeye Shaker Square Development Corporation, and even groomed impoverished young men from difficult backgrounds—even Johnson's own family and wards—to help carry out their fraud. This is no ordinary public corruption case.  The depth, breadth, and impact of the corrupt and deceptive schemes designed and orchestrated by Johnson and Jamison warrant a custodial sentence at the high-end of the Guidelines range.

### B.    History and Characteristics of the Defendants

#### i.    Kenneth Johnson

Johnson has been afforded the privilege of serving the citizens of Cleveland for more than two decades.  (R. 153: Johnson Final PSR, PageID 4572).  Johnson came from a family of means who, according to him, was even able to donate upwards of $10,000 annually to the former Kenneth Johnson Recreation Center from approximately 1981 to 2018.  (R. 128: Johnson, K., Trial Tr., PageID 3904, 3906).  Johnson described his grandfather, Bishop Looper, as "a very wealthy man."  (Id.).  Johnson's mother lived to 77, his father to 52.  (R. 153: Johnson Final PSR, PageID 4583).  Johnson testified that his mother was a registered nurse and was going to medical school, and his father was a supervisor at TRW.  (Id., PageID 3909).  Johnson described his family as "middle class" and noted that he "[n]ever wanted for anything."  (Id.)  His family was not touched by drug addiction or alcoholism.  (R. 153: Johnson Final PSR, PageID 4583). Johnson enjoys the support of his brother and adoptive children.  (Id., PageID 4583).

Although he has experienced health issues in the past, he has been able to afford medical treatment at the Cleveland Clinic.  (Id.).  Before his indictment, Johnson was earning a salary of $89,000 annually and drawing an annual pension of $73,008—a total income of just over $162,000.  (Id., PageID 4584).

      ii.    <u>Garnell Jamison</u>

Like Johnson, Jamison too grew up in a household with both his mother and father.  (R. 151: Jamison Final PSR, PageID 4547).  His father lived to age 78, and his mother, age 85, currently resides in Cleveland, Ohio.  (Id.). Jamison is close with some of his siblings and is an active father in his son's life.  (Id., 4547).  Jamison is in good physical health.  (Id., PageID 1548).  Jamison had the benefit of not only a high school diploma but also a bachelor's degree from University of Toledo.  (R. 153: Jamison Final PSR, PageID 4549).  Prior to indictment, Jamison worked at the City as Johnson's executive assistant since 1992, earning $44,000 a year.  (Id., PageID 4549)  In addition to his employment with the City, from 1990 to 2018 Jamison purportedly held a second full-time job as the supervisor for the BSSDC landscaping program where he earned an additional $62,000 per year.  (Id.)

      iii.    <u>Johnson and Jamison Broke the Law Despite Privilege and Status</u>

As noted above, both Johnson and Jamison lived lives that were very different to the lives of many Ward 4 residents.  They grew up in families which afforded them opportunities to do just about anything they wanted.  Despite these options, Johnson and Jamison chose crime.  The Court should consider this decision when imposing its sentence.

**C.**    **The Purposes of Sentencing: Deterrence and Promoting Respect for the Law**

We have heard too often from politicians convicted of public corruption—"everyone was doing it."  Without certain and sufficient consequences for corrupt behavior fraudulent practices

continue and corrupt systems flourish.  The citizens of the city of Cleveland deserve better than what Kenneth Johnson and Garnell Jamison provided.  To promote respect for the law and provide deterrence, it is important to send a message that corrupt conduct—even by long term public officials like Johnson and Jamison—is serious and will not be tolerated.  In public corruption cases especially, it is important for anyone who might consider a similar course of action to see that someone who misuses a position of public trust for his own benefit will face strict punishment.  *See United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (noting that general deterrence is particularly effective in cases involving economic and public corruption crimes);  *see also United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (key objective of sentencing should be "to send a message to other [public officials] that [bribery] is a serious crime that carries with it a correspondingly serious punishment");  *United States v. Morgan*, 635 Fed. App'x 423, 450-51 (10th Cir. 2015) (noting that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one" and concluding a sentence of probation was unreasonable and "encourage[d] rather than discourage[d] [public officials] from engaging in [bribery] because they might conclude that the only penalt[y] they will face if they are caught [is probation]").  It is also important for members of the public to see that when their trust is betrayed, meaningful consequences follow.  "Without meaningful consequences for a breach of trust, their trust is no more than blind trust."  *Morgan*, 635 Fed. App'x at 450.

Likewise, a significant sentence will also assure the public that "white collar criminals will not be dealt with less harshly than those criminals who have neither the wit nor the position to commit crimes other than those of violence."  *United States v. Brennan*, 629 F. Supp. 283, 302 (E.D.N.Y. 1986); *see also United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (noting that

"[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes").

There is a critical interest that must be vindicated when a politician who helps authorize, and levy taxes is himself a tax cheat.  Indeed, general deterrence occupies an especially important role in sentencing for criminal tax offenses.  As the Sentencing Commission has stated:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would be violators.

Introductory Cmt. to U.S.S.G. § 2T1.1. *See also United States v. Weaver*, 126 F.3d 789, 793 (6th Cir. 1997).  In imposing a sentence, the Court must send a message that none of us—even those who are elected to lead—are absolved of our collective responsibility to support the nation and the plethora of causes and campaigns pursued with our tax dollars.

**V.  No Departure of Variance is Warranted in this Case**

Johnson and Jamison made great issue of the good deeds they did for the community and have both submitted letters of support highlighting the same.  Such letters should not be dispositive as many defendants who receive them often are deserving of imprisonment.  *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants … continue to receive the love and support of their families," and "[m]any, in turn, love their families and friends … and participate in charitable activities").  The

fact that many of Defendants' family, friends, and neighbors (and others they showered with money and benefits) think highly of them make them different from most other white-collar criminals. *See United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").

Although defendants may have supporters who will describe their good deeds and character, the Seventh Circuit suggests that this type of evidence should be weighed cautiously (at best) in deciding a sentence for a public official. In *United States v. Vrdolyak*, 593 F.3d 676, (7th Cir. 2010), Judge Posner found that the district court placed too much weight on letters written on behalf for a number or reasons, including:

> Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largess should not weigh in sentencing.

*Id.* at 683. Instead, Defendants' actions and words they did when they thought no one was listening or observing them speak louder than any after-the-fact testimonials in their favor.

Additionally, while Defendants may lay claim to various good deeds they have performed, various courts of appeals have reversed as an abuse of discretion departures predicated on service to the public that was extremely compelling. *See United States v. Winters*, 105 F.3d 200, 209 (5th Cir. 1997) (reversing a downward departure based on the defendant's distinguished military service, during which he was twice wounded in combat and awarded two Purple Heart medals); *United States v. Rybicki*, 96 F.3d 754, 758-59 (4th Cir. 1996) (reversing a departure based on the national service of "a highly decorated Vietnam War veteran who had

saved a civilian's life during the My Lai incident and had an unblemished record of 20 years of service to his country, both in the military and in the Secret Service").

Moreover, those good deeds described by the character witnesses or detailed in any letters on the Defendants' behalf must be squared with their actions and words in this case. Here, past good deeds do not mitigate the Defendants' actions in using a funds intended for one of Cleveland's most vulnerable communities to enrich the man who was elected to represent that community. Indeed, the political gladhanding described by Judge Posner may be precisely why Johnson and Jamison were able to carry on their schemes undetected for so long. That some members of the community were helped despite Johnson taking his illegal cut in secret does not alleviate the harms caused by that theft. For a community like Buckeye Shaker, the money Johnson stole could have made a very great difference.

More broadly, individuals in Defendants' shoes, who have had the opportunity to do good work and build relationships with influential people, are not entitled to a get-out-of-jail-free card, particularly for serious crimes. As the Eighth Circuit stated, in general, white-collar criminals "enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994). "[W]e expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id.*; *see also United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (finding defendant's good works unremarkable); *United States v. Millar*, 79 F.3d 338, 345 (2d Cir. 1996) (refusing to review the district court's decision not to depart based upon the defendant priest's charitable works and public service, where the district court recognized its authority to depart; the defendant "had benefits that few defendants have, including education, respect in his work, skills of advocacy,

intelligence, and the calling to serve as a priest"); *United States v. Jordan*, 130 F.Supp.2d 665, 672-73 (E.D. Pa. 2001) (denying a departure for a defendant convicted of money laundering, despite numerous letters detailing substantial charitable contributions, generosity to community members in need of food, and service as mentor for neighborhood youths; these acts, "while commendable, are not so exceptional or extraordinary for a person" like the defendant who owned a small business); *United States v. Scheiner*, 873 F.Supp. 927, 933-35 (E.D. Pa. 1995) (departure was not warranted for a doctor convicted of conspiring to defraud an insurance company, despite his contributions to the young and poor minorities, including financial sponsorship of several basketball teams, serving on several community boards, working in a podiatry clinic where free services were provided to the poor, and generally [having] served as a source of support and inspiration to many).

These decisions are grounded in the recognition that individuals with sufficient stature, ability, and opportunity to earn sizable incomes are often involved in community service and charitable endeavors, and such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses. Indeed, it is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to 'equalize punishments for white collar and blue collar crime,'" and courts have endeavored to implement that intention in sentencing. *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004) (reversing the district court's downward departure where the white-collar defendant's good works, although "admirable," were insufficient to qualify as exceptional in light of, among other things, his status as a prominent corporate executive with the means to make financial contributions and engage in civic and charitable activities), vacated on other grounds, 125 S. Ct. 984 (2005); *see also United States v. Wright*, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding the district court's denial of a

31

downward departure where the defendant minister's good works, although "profound," "substantial," and "sustained," were not so extraordinary as to justify a downward departure).

As District Judge Marrero in the Southern District of New York observed:

> [W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.

*United States v. Fishman*, 631 F. Supp.2d 399, 403 (S.D.N.Y. 2009). To permit departures primarily based on such charitable activity would in effect be penalizing poorer defendants.

Certainly, the Court should consider what genuine good deeds the Johnson and Jamison have done. These are nice. But these good acts must be balanced against the corruption and deceit they exhibited in this case. This Court should decline to treat favorably those defendants with the means—whether lawfully or unlawfully obtained—to dole out favors to the very community from which they are stealing. That is what Johnson and Jamison did here.

## VI. Defendants' General Denial of the PSR's Factual Allegation

Both Johnson and Jamison used their objections and sentencing briefs to make general denials of several factual findings made in the PSR. The Sixth Circuit has found that:

> [a] defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

*United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003), citing *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994) (citations and internal quotation marks omitted), *see also United States v. Dolan*, 1996 U.S. App. LEXIS 27354, *23, No. 95-1769, 1996 WL 599819 (6th Cir. Oct. 17, 1996) ("[A] defendant who challenges factual allegations in the PSR [presentence report] has the burden of producing some evidence beyond a bare denial that calls the reliability or correctness of the alleged facts into question."

As Johnson and Jamison made only "mere denials" without producing any evidence to support their denials, they have both failed to meet their burden.  The government joins the Probation Department in supporting the factual findings made in the presentence report.

**VII.**    **Restitution must be ordered against Defendants pursuant to the Mandatary Victim Rights Act.**

Restitution orders are authorized by statute, 18 U.S.C. §§ 3663, 3663A, and 3664, and are distinct and separate from the United States Sentencing Guidelines.  When sentencing a Defendant convicted of an offense against property under Title 18 of the United States Code, including any offense committed by fraud or deceit, the Mandatory Victims Restitution Act (the "MVRA") requires the court to order that the defendant make restitution to the victim of that offense.  18 U.S.C. §§ 3663A(a)(1); 3663A(c)(1)(A)(ii).  The MVRA requires those convicted of offenses against property under Title 18 to pay restitution for victims' losses.  *United States v. Elson*, 577 F.3d 713, 721 (6th Cir. 2009).

Restitution constitutes punishment.  *United States v. Schulte*, 264 F.3d 656 (6th Cir. 2001); *see also United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) (restitution is "punitive rather than compensatory in nature").  "Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity." *United States v.*

*Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005). "Restitution under the MVRA is a criminal penalty and a component of the defendant's sentence." *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004) (*quoting United States v. Chaney*, 964 F.2d 437, 451 (5th. Cir. 1992)).

The MVRA specifically states that the amount of restitution should be equal to the "amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (when a court is ordering restitution, the amount of restitution should be equal to the "amount of each victim's losses as determined by the court." *Sosebee*, 419 F.3d at 462 (18 U.S.C. § 3664(f)(1)(A) (emphasis in original)).

A.       **Kenneth Johnson and Garnell Jamison Are Jointly and Severally Responsible Restitution Payable to the United States Department of Housing and Urban Development ("HUD") and the Internal Revenue Service ("IRS")**

In this case, the IRS and HUD were directly harmed because of the fraudulent actions of Kenneth Johnson, Garnell Jamison, and Robert Fitzpatrick.  The losses to the IRS and HUD would not have occurred if not for the Defendants' actions.  Courts have consistently affirmed restitution orders to government agencies and hold such agencies eligible as victims.  *See United States v. Senty-Haugen*, 449 F.3d 862, 865 & n.3 (8th Cir. 2006).  The wide language of Title 18 as defining a victim as any person allows courts to order restitution payments to be made to the United States and its agencies.

i.       Kenneth Johnson

Kenneth Johnson owes restitution in the total amount of $746,839.38, payable as follows:

1.       $610,764.29, jointly and severally with Garnell Jamison, payable to HUD;

2.       $127,615.26, jointly and severally with Garnell Jamison, payable to IRS.

ii.       Garnell Jamison

Garnell Jamison owes restitution in the total amount of $738,379.55, payable as follows:

1.  $610,764.29, jointly and severally with Kenneth Johnson, payable to HUD; and

2.  $127,615.26, jointly and severally with Kenneth Johnson, payable to IRS.

Restitution payments shall be sent to the Clerk of Court at U.S. Court House, 801 West Superior Avenue, Suite 1-127, Cleveland, Ohio 44113.   The Clerk may direct HUD payments to: Department of Housing and Urban Development, US Bank, HUD-FAD Collections Ft. Worth, P.O. Box 6200- 05, Portland, Oregon 97228-6200.  The Clerk may direct IRS payments to: Internal Revenue Service, IRS-RACS, Attn: Mail Stop 6261 Restitution, 333 West Pershing Avenue, Kansas City, MO 64108.

## B.    Restitution to the IRS is Higher than the Guidelines Loss, Which Does Not Include Interest

In crafting an appropriate sentence, the Court must also consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).  Generally, under U.S.S.G. § 5E1.1(a)(2), when a defendant has been found guilty after a trial of a tax crime under Title 26 and a court finds that the government has suffered a loss, the defendant should be ordered to make restitution as a condition of supervised release. *See* U.S.S.G. § 5E1.1(a)(2) (providing that "the court shall . . . (2) impose a term of probation or supervised release with a condition requiring restitution for the full amount of the victim's loss, if the offense is not an offense for which restitution is authorized under 18 U.S.C. § 3663(a)(1) but otherwise meets the criteria for an order of restitution under that section.").  Neither 18 U.S.C. § 3663 nor § 3663A provide for restitution as an independent part of the sentence for offenses under Title 26.  *See United States v. Joseph*, 914 F.2d 780, 783-84 (6th Cir. 1990); *United States v. Hoover*, 175 F.3d 564, 569 (7th

35

Cir. 1999).  However, a combination of statutes, when read together, allows district courts to order restitution for Title 26 offenses as a condition of supervised release or probation.

District courts are authorized by 18 U.S.C. 3583(d) to impose, as a condition of supervised release, "any condition set forth as a discretionary condition of probation in section 3563(b)."  Section 3563(b) authorizes a district court to order a defendant to "make restitution to a victim of the offense under section 3556."  Section 3556 authorizes a district court to "order restitution in accordance with section 3663," which in turn provides that a court "may order . . . that the defendant make restitution to any victim of such offense." And although § 3663 by its own terms limits restitution to certain (non-Title 26) offenses, § 3563(b) expressly provides that § 3663's limitation in scope does not apply to restitution as a condition of probation (or, accordingly, as a condition of supervised release).  *See United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002); *United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir. 1996); *United States v. Daniel*, 956 F.2d 540, 543-44 (6th Cir. 1992); *United States v. Bok*, 156 F.3d 157, 167 (2d Cir. 1998).  Additionally, the case law is clear that the Court may include interest in the restitution computation to address the full extent of the IRS's losses.  *See, e.g., United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013).

Pursuant to the foregoing authority, the government asks the Court to order the defendants to pay restitution to the IRS as a condition of supervised release in the amount of $127,615.26, which represents the taxes and interest (calculated through the date of sentencing) associated with the tax offenses of conviction.  These amounts are as follows:

| Tax Restitution for Tax Years 2013 - 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **Sums** |
| **Tax** | $15,703 | $14,165 | $16,937 | $18,663 | $22,125 | $16,679 | $104,272.00 |
| **Interest** | $5,339.13 | $4,255.27 | $4,427.07 | $3,956.96 | $3,628.96 | $1,735.87 | $23,343.26 |
| | | | | | | **Total** | **$127,615.26** |

C.      **Defendant Kenneth Johnson's assets should be liquidated and paid to restitution immediately.**

Any non-exempt assets that can be applied towards criminal restitution obligations, should be liquidated, and paid to restitution immediately.  *See generally* 18 U.S.C. § 3613 (covering the United States' enforcement capabilities and discussing the very limited exemptions to enforcement).  The United States Attorney's Office is mandated by Congress to fully enforce collection of restitution of the law. 18 U.S.C. §§ 3613, 3664(m).  Johnson's non-exempt assets should be liquidated for payment of restitution under the MVRA.  18 U.S.C. § 3663A.  By requesting the Court to address these assets prior to judgment – to exercise the authority permitted by statute and contemplated by the Mandatory Victims Restitution Act – the United States avoids having to engage in unnecessary secondary post-judgment litigation. Because Johnson would be required to pay 100% of these non-exempt assets to his restitution in a post-judgment enforcement action under the FDCPA, there is no reason for the Court to order anything different at the time of sentencing.

Additionally, ordering Kenneth Johnson to pay 100% of the proceeds of his non-exempt assets to the restitution judgment at the time of sentencing saves resources of the United States that would be used for service of process for post-judgment enforcement actions.  If Johnson is ordered to liquidate the properties at the time of sentencing, he avoids the potential imposition of a litigation-related surcharge, and the Court enjoys judicial economy because the Court will avoid piecemeal enforcement of a restitution judgment.

Johnson has substantial non-exempt assets that can be applied towards his forthcoming restitution obligations, including:

1.      $118,000 in proceeds from the March 2021 sale of the defendant's recreational vehicle;

2.      $125,000 in settlement proceeds from Forbes Fields Attorneys for Johnson's motor vehicle accident;

3.      $124,195.19 in an OPERS money purchase account (Johnson's OPERS Traditional Pension Plan has a monthly benefit of $6,384.22, which could be liquidated for the lump sum of $124,195.19);

4.      Shares of unknown stock held by the Defendant's son with a value of $4,000; and

5.      $125,000 in equity in non-primary residential property located at 2948 Hampton Road, Cleveland, Ohio.

**D.     Specific payment terms requested**.

The United States requests that the Court establish the following conditions of restitution payment in accordance with the Court's authority under 18 U.S.C. §§ 3572 and 3664(f), which should be applicable until such time as Kenneth Johnson has satisfied the financial obligations to be imposed by the judgment:

1.      Liquidate financial accounts and apply proceeds to restitution;

2.      Liquidate non-residential property and apply proceeds to restitution;

3.      Apply car accident settlement proceeds to restitution;

4.      The special assessment must be paid in a lump sum due immediately; and

5.      Payment of restitution is due immediately.  Any restitution amount that remains unpaid when the Defendant's supervision commences is to be paid on a monthly basis at a rate of at least 25% of Defendant's gross earnings via OPERS, to be changed during supervision, if needed, based on Defendant's changed circumstances, pursuant to 18 U.S.C. § 3572(d)(3).  If Defendant receives an inheritance, any settlements (including divorce settlement and personal injury settlement), gifts, tax refunds, bonuses, lawsuit awards, and any other receipt of money (to include, but not be limited to, gambling proceeds, lottery winnings, and money found or discovered) the defendant must, within 5 days of receipt, apply 100% of the value of such resources to any restitution still owed.

### III.     Conclusion

For the foregoing reasons, the government asks this Court to impose a sentence at the high-end of the advisory Guidelines range: for Kenneth  Johnson, a sentence of imprisonment between 109 and 121 months, with restitution of $746,839.38 as detailed herein, and a special assessment of $1,500, together with a three-year period of supervised release; and for Garnell Jamison a sentence of imprisonment between 75 and 87 months, restitution of $738,379.55 as outlined herein, and a special assessment of $1,500, together with a three-year period of supervised release.

Respectfully submitted,

BRIDGET M. BRENNAN
Acting United States Attorney

By:     /s/ *Justin Seabury Gould*
Justin Seabury Gould (OH: 084584)
Megan R. Miller (OH: 0085522)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone: (216) 622-3869/3855
Facsimile: (216) 522-2403
Justin.Gould@usdoj.gov
Megan.R.Miller@usdoj.gov